## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| SUSAN MORT, | * | CIVIL NO. 4:15-cv-00240-JAJ-SBJ |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | **REPORT** |
| | * | **AND RECOMMENDATION** |
| CAROLYN W. COLVIN, | * | |
| Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |
| | * | |

## I. INTRODUCTION

Plaintiff Susan Louise Mort worked for twenty-five years as a secretary, receptionist and teacher's associate until she stopped in January 2010 at the age of forty-nine due to health problems. She describes her impairments as including "osteoarthritis of bilateral knees, status post knee replacement of left knee, stage III osteoarthritis of bilateral hand joints, chronic low back pain and sciatica, migraines, peripheral venous insufficiency, lower extremity edema, carpal tunnel, incontinence, obesity and mental health conditions." (Complaint (Dkt. 1) ¶ 3.) She brought this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security denying her disability benefits under the Social Security Disability program. (*Id.* ¶ 1.) The case was referred to this Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for submission of a report and recommendation regarding disposition. (Dkt. 7.) As set forth below, it is recommended that the decision of the Commissioner be affirmed.

## II. PROCEDURAL HISTORY

Mort applied for Social Security Disability Insurance Benefits and Supplemental Security Income on June 20, 2012, with an alleged disability onset date of January 22, 2010.

(Administrative Record ("A.R.") 49-50.)[1]   The Social Security Administration denied her application for benefits initially on September 26, 2012, and upon reconsideration on December 4, 2012. (A.R. 85, 90.)   Based on a timely request for hearing, Mort's claim was heard before Administrative Law Judge ("ALJ") Thomas M. Donahue on January 9, 2014. (A.R. 12, 94-95.) Mort was represented by counsel and testified on her own behalf. (A.R. 30-42.)   Vocational expert Vanessa May responded to hypotheticals presented by the ALJ and Mort's counsel. (A.R. 42-44.)

The ALJ issued a written decision denying Mort benefits on January 31, 2014. (A.R. 12-23.)   Mort timely requested review of the ALJ's decision and the Appeals Council denied review on June 1, 2015. (A.R. 1-8.)   Consequently, the decision of the ALJ stands as the final decision of the Commissioner. (*Id.*)

Mort filed her Complaint before this Court on July 28, 2015.   She asserts the decision is in error because (1) the ALJ "improperly rejected [her] subjective allegations," (2) the ALJ "failed to comply with SSR 96-8p by performing a 'function by function' assessment," and (3) "the hypothetical question posed to the vocational expert does not adequately represent [her] limitations." (Complaint ¶¶ 11-13.)   She requests that this Court reverse the final decision of the Commissioner or, in the alternative, vacate the final decision of the Commissioner and remand this matter for further proceedings. (*Id.* ¶ 15.)   The Commissioner filed an Answer (Dkt. 3) and a copy of the Administrative Record (Dkt. 4) on October 28, 2015.

Mort filed an initial Brief (Dkt. 6) in support of her claims on December 23, 2015.   The Commissioner submitted a responsive Brief (Dkt. 8) on February 18, 2016, to which Mort filed a Reply Brief (Dkt. 11) on March 2, 2016.   On June 14, 2016, this Magistrate Judge ordered the parties to submit additional briefing on certain issues. (Dkt. 12.)   The Commissioner filed a

---

[1] Mort filed a prior application for benefits in June, 2011, which was denied by the Social Security Administration initially and upon reconsideration. (A.R. 47-48.)

Supplemental Brief (Dkt. 13) on June 27, 2016, followed by the submission of a Reply (Dkt. 14) by Mort on July 8, 2016.

After reviewing the written submissions, it was determined that a hearing was not warranted.   The matter is considered to be fully submitted.

### III. STANDARD OF REVIEW

When performing judicial review, "[t]he court's task is to determine whether the ALJ's decision 'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (quoting *Ford v. Astrue,* 518 F.3d 979, 981 (8th Cir. 2008)); *see also*, *e.g.*, *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (court "'will affirm the ALJ's findings if supported by substantial evidence on the record as a whole'") (quoted citations omitted)).   "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)); *see also Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed. 2d 842 (1971) (Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))).

The "court must consider evidence that supports and detracts from the ALJ's decision," but "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (quoting *Perkins*, 648 F.3d at 897).   Thus, "[e]ven if substantial evidence supports a contrary outcome, [the court] may not reverse so long as the Commissioner's decision also is supported by substantial

evidence." *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004).

> [The court] will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the court] might have reached a different conclusion had [it] been the initial finder of fact.

*Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (internal quotations and citations omitted)).

The court may reverse the ALJ's decision if it is based on legal error. *Neal v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005); *see also Lauer v. Apfel*, 245 F.3d 700, 702 (8th Cir. 2001).   "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (internal citations omitted).

## IV. REVIEW OF ADMINSTRATIVE RECORD

This Magistrate Judge has reviewed the entire Administrative Record (Dkt. 4) but will summarize only certain portions as background for the specific issues presented by the parties.

### A. Medical Records

On June 9, 2008, Mort saw Dr. Vikas Sharotri to be evaluated prior to surgery for left knee arthroplasty at the University of Iowa Hospitals and Clinics. (A.R. 316.)   In the physical exam by Dr. Sharotri, it was noted that Mort has a history of lower extremity edema which has been stable for the last year. (A.R. 320.)   On exam, it was noted Mort's "lower extremity examination reveals bilateral soft pitting 1+ lower extremity edema." (A.R. 321.)

Mort was seen by Physician Assistant Nealy Neukirch on March 28, 2011, complaining of, among other things, finger pain, stiffness and soreness in both hands. (A.R. 506-511.)   As a result, pain medication was suggested to Mort and x-rays and laboratory work was ordered to investigate those issues (A.R. 511.)   Physician Assistant Neukirch noted in the exam was that Mort was not suffering from any edema. (A.R. 510.)   Dr. Robert Post examined the x-rays of her hands, and noted that Mort suffers from grade 3 osteoarthritis of the right third distal interphalangeal joint,

grade 2 osteoarthritis of the right and left second DIP joints, both first carpometacarpal joints, and first metacarpophalangeal joints. (A.R. 512.)

On March 16, 2012, Mort met with Dr. Vanaja Thondapu, for issues with her toes and a complaint of sciatic nerve pain. (A.R. 626.)   In a "review of systems," Dr. Thondapu noted that Mort denies chest pain, edema and palpitations. (A.R. 627.)   Further, in the exam notes, Dr. Thondapu notes no edema. (A.R. 627.)   Mort's psychiatric status was noted as normal judgment (mildly depressed). (A.R. 627.)

Mort met with Lindsey Clark, Physician Assistant, on November 9, 2012 for complaints, including bloody noses, lower back pain and swelling/varicose veins in her ankles. (A.R. 682.) Mort reported that she does not elevate her feet much. (A.R. 682.)   Physician Assistant Clark noted edema in both of Mort's lower extremities. (A.R. 683.)

Reporting continuing issues with her toes, on December 4, 2012, Mort saw Dr. Mica Murdoch. (A.R. 679-681.)   Dr. Murdoch's observations at this exam included a note that Mort's "[s]kin texture and turgor are diminished with some pitting edema bilateral feet." (A.R. 679.)

Mort saw Dr. Murdoch on March 4, 2013, complaining of long, thick, painful toenails. (A.R. 697.)   Dr. Murdoch's objective observations included that Mort's skin texture and turgor are diminished, with some pitting edema in her bilateral feet. (A.R. 697.)

On April 5, 2013, Mort saw Dr. Yulia Asner for complaints of hand pain. (A.R. 692.) Mort reported that she had numbness in her hands on and off for years, but that she had been experiencing it more lately. (A.R. 692.)   She was prescribed pain medication. (A.R. 694.)

Dr. Wendy Waldman Zadeh also evaluated Mort on June 11, 2013, with respect to complaints in her hands. (A.R. 753.)   Mort complained to Dr. Zadeh of continued numbness in her hands, worsening in the last six months, and greater pain in her right hand than her left hand. (A.R. 753.)   Mort stated that her left hand is numb in the morning when she wakes up. (A.R. 753.)

After examination, Dr. Zadeh's impression was that Mort has left median neuropathy at the wrist, which appears in the mild to moderate range on nerve conduction studies. (A.R. 753.)   Mort was given splints for both hands. (A.R. 753.)   Dr. Zadeh found that Mort's electromyogram assessing nerve and muscle activity appeared within normal limits. (A.R. 753.)

On July 8, 2013, Mort saw Dr. Asner for a follow-up on her hands. (A.R. 748.)   Mort indicated she had been wearing braces for a month, but still has numbness and tingling in her fingers. (A.R. 748.)   Mort had not performed physical therapy at that time, and Dr. Asner indicated that physical therapy would be the next step. (A.R. 748.)   Dr. Asner's exam of Mort found no edema present. (A.R. 750.)

At her first physical therapy appointment on July 29, 2013, Mort was given bilateral wrist splints to wear full-time, and received education on the positioning of her hands and wrists to avoid increased symptoms. (A.R. 703-705.)   She reported that her pain is worse at night, and it limits her ability to crochet and cross-stitch. (A.R. 703.)

Mort's second appointment for physical therapy was on August 12, 2013. (A.R. 702.) Although her overall hand pain decreased, Mort reported that she continued to have some symptoms in her hands. (A.R. 702.)   Mort noted she had not been doing her exercises as much as she should. (A.R. 702.)   The plan, at that point, was to continue with the current physical therapy. (A.R. 702.)

Mort appeared for her last physical therapy appointment on August 26, 2013. (A.R. 700-701.)   She reported no change in her hands, with pain and numbness varying mainly in her thumb and index finger. (A.R. 700.)   Because there was no change in her symptoms after undergoing conservative treatment, Mort was discharged from therapy due to a lack of progress. (A.R. 700.)   She was instructed to continue with conservative treatment until further follow-up with her doctor on September 9, 2013. (A.R. 700.)

On September 3, 2013, Dr. Murdoch met with Mort concerning issues with her toenails. (A.R. 726.)   On exam, Dr. Murdoch noted slight edema to the bilateral feet. (A.R. 726.)

Mort met with Dr. Asner on September 9, 2013 for a medical evaluation with respect to hypertension. (A.R. 721.)   Mort reported to Dr. Asner, among other things, that she was having edema in her ankles, her skin is tight, and they are starting to hurt. (A.R. 721.)   Dr. Asner's exam noted these issues as well. (A.R. 723.)   Mort further reported she takes pain medications for her joint pain. (A.R. 721.)   The medications were changed to address the joint pain. (A.R. 724.)

**B.  Assessments**

On July 20, 2011, Dr. Gary Cromer completed a physical residual functional capacity assessment of Mort. (A.R. 526-533.)   With respect to exertional limitations, Dr. Cromer noted Mort would need to stand and stretch after sitting one hour. (A.R. 527.)   Further, handling (gross manipulation) was found to be limited to "frequently." (A.R. 529.)   No other limitations were noted with respect to manipulative limitations by Dr. Cromer. (A.R. 529.)   Dr. Cromer reported Mort states she performs personal care, prepare meals, does some dusting and some laundry, drives and goes shopping. (A.R. 533.)   Dr. Cromer reviewed Mort's pain form, which indicated she provides considerable assistance to her parents. (A.R. 533.)   Dr. Cromer found Mort's allegation that her walking is limited to just 25 feet is inconsistent with the activities of daily living she has indicated, and this erodes the credibility of this allegation. (A.R. 533.)

On August 8, 2011, Dr. Timothy Wahl, a licensed psychologist, performed a disability evaluation and mental status exam. (A.R. 534-538.)   In their meeting, Mort reported to Dr. Wahl that her doctor tells her she has carpal tunnel in both of her hands, and that this results in tingling and numbness. (A.R. 534.)   Mort reported that she has not had surgery for this.   (A.R. 534-535.) With respect to psychiatric issues, Mort stated she has never had inpatient treatment, nor has she has ever been in counseling. (A.R. 535.)   She has been taking a psychotrophic medication,

Celexa, for the last two years. (A.R. 535.)  Mort denied a history of psychosis, and she was unaware of any mental illness in her family. (A.R. 535.)  Mort reported that she has experienced passing suicidal thoughts over the past couple of years due to her declining health, however, she has never made any attempts to harm herself. (A.R. 535.)

Mort described her daily functioning as follows: she is able to prepare quick and simple meals for herself; she goes shopping with her mother, and uses an electric cart to get around; she helps with laundry, although stairs are difficult; she helps with household chores, including vacuuming and dusting, but has to work in short spurts with frequent rests; she helps with dishes, but does have some trouble gripping items due to her hand issues; she is no longer able to take baths as she is not able to get in and out of the bath tub, but does maintain her hygiene daily despite pain; she has her driver's license, but on longer trips it is difficult for her to grip the steering wheel and she needs to get out of the car every hour to stretch. (A.R. 535.)  Mort further reported her typical daily activities as rising at 9:00 a.m., showering and getting dressed, eating, helping care for her parents throughout the day, taking her medication, watching TV, checking emails, performing chores or errands, playing computer games, watching the news, eating supper, visiting with her parents and TV in the evening. (A.R. 535.)

Dr. Wahl's diagnostic impressions are that Mort suffers from an adjustment disorder, depressed mood and dependent personality features. (A.R. 538.)  Dr. Wahl concludes that Mort's overall cognitive functioning appears grossly intact, and she appears suited to a wide range of unskilled and skilled employment positions. (A.R. 537.)  Mort is considered of average intelligence, and appears capable of comprehending basic vocational instructions and procedures. (A.R. 537.)  Mort's attention, memory and concentration appear intact, however, she will experience mild to moderate difficulties with remembering and carrying out instructions and procedures, as well as maintaining pace due to distracting pain and emotional factors. (A.R. 537.)

Dr. Wahl noted Mort appears to have the skills necessary to relate effectively with coworkers and supervisors, and any significant history of conflict with others on or off the job was denied. (A.R. 537.)   Dr. Wahl further noted Mort appears capable of responding appropriately in the work place, however, task demand should be kept relatively simple and routine at this point. (A.R. 537.)   If awarded benefits, Mort appears capable of managing her own finances. (A.R. 537.)

A psychiatric review technique form was completed on August 23, 2011, by Myrna Tashner, Ed.D. (A.R. 539-552.)   Dr. Tashner assessed Mort from February 2009 to the date of her report, and found her medical impairments to be not severe. (A.R. 539.)   Dr. Tashner noted Mort has an adjustment disorder with depressed mood, and suffers from dependent personality traits. (A.R. 542, 546.)   Dr. Tashner found Mort to have no restriction of activities of daily living, no difficulties maintaining social functioning, mild difficulties in maintaining concentration persistent or pace, and no episodes of decompensation. (A.R. 549.)   Dr. Tashner noted that Mort does receive any mental health treatment, but does take Celexa through her primary care physician. (A.R. 551.)   Dr. Tashner futher noted that due to the paucity of evidence, Mort was sent to her for a mental status exam. (A.R. 551.)

On exam, Mort's attention and concentration were intact, and her thought processes goal directed and coherent. (A.R. 551.)   Although Mort has stressors, she states she is still capable of handling them. (A.R. 551.)   Dr. Tashner noted that Mort indicated she could complete daily activities such as hygiene, home maintenance and shopping, although she has physical problems with completing the tasks. (A.R. 551.)   Mort also cooks, cleans, shops and takes care of her aged parents, attends church and teaches Sunday school. (A.R. 551.)   Dr. Tashner found the credibility of Mort's allegations are partially eroded as her account of mental limitations are not consistent with the third-party reports or the mental status exam. (A.R. 551.)   Mort reported she has trouble understanding directions, but this is inconsistent with third-party accounts that she has no trouble

understanding directions and is "very smart." (A.R. 551.)   Although the mental status exam found Mort's vocation should be kept relatively simple and routine, this is inconsistent with the reported functioning level on exam, and third-party reports of her activities of daily living. (A.R. 551.)   As a result, Dr. Tashner does not give this finding weight. (A.R. 551.)   Dr. Tashner concluded Mort has some mild concentration problems dealing with her pain, but these only minimally affect her ability to carry out tasks. (A.R. 551.)   Therefore, Dr. Tashner concluded the diagnosis of adjustment disorder with depressed mood is non-severe. (A.R. 551.)

On January 10, 2012, Dr. Dennis Weis reviewed the evidence in the file, and the physical residual functions capacity assessment from July, 2011.   Dr. Weis indicated that upon reconsideration, Mort has continued pain and uses a cane. (A.R. 591.)   Dr. Weis noted that the issues indicated by Mort have been discussed in the previous assessment, and her exam remains unchanged from that noted previously. (A.R. 591.)   Dr. Weis noted there is no documentation to support the need for an assistive device, manipulation issues have been discussed in the previous assessment, and Mort's need for periodic alternating positions could be achieved with usual breaks, and could be accomplished by standing and stretching after sitting one continuous hour. (A.R. 591.)   Dr. Weis concluded there is no new evidence to further impact the previous assessment. (A.R. 591.)

On January 13, 2012, Dr. Dee Wright performed a review and update concerning Mort's mental health concerns. (A.R. 592.)   Dr. Wright noted updated information was requested, and the entire file was reviewed. (A.R. 592.)   Dr. Wright found Mort's mental health concerns remain non-severe, and the prior assessment from August 23, 2011, was affirmed as written. (A.R. 592.)

Mort met with Raymond Tibe, a licensed clinical psychologist on September 4, 2012, for a mental status exam. (A.R. 659.)   Dr. Tibe discussed with Mort her difficulty with pain and fatigue and noted that she had multiple medications listed for pain and depression. (A.R. 659.)   Mort

reported that she is depressed all the time, she cries on a daily basis, for the past few years things have been getting worse mood-wise, and she feels isolated and frustrated. (A.R. 659.)   Mort denied any history of psychiatric hospitalization, and reported a history of counseling when she was a child. (A.R. 659.)

Concerning her mental status, Dr. Tibe noted Mort appeared in casual and well-kept clothing, and that her thoughts were clear, and her associations were appropriate. (A.R. 660.)   Dr. Tibe's diagnostic impressions included depressive disorder, not otherwise specified, and adjustment disorder with depressed mood related to pain. (A.R. 660.)   Dr. Tibe further indicated that, with respect to work-related activities, he could see where the client's mental and physical status would make the maintenance of attention, concentration and pace difficult. (A.R. 660-661.) Mort's ability to process incoming information is intact, her ability to relate to people is intact; and her judgment is intact. (A.R. 660-661.)

## C.  Function Reports

Mort completed three function reports during the course of these proceedings, with the latest dated October 25, 2012. (A.R. 268-275.)   Mort noted that her illnesses make it impossible for her to stand, bend and sit for long periods of time without severe pain. (A.R. 268.)   Mort's daily activities include getting up in the morning, showering, eating, doing daily chores, helping her parents with errands, cooking dinner, decompressing and going to bed. (A.R. 269.)   She provides care for her parents by helping them with day-to-day items, taking them places, putting in eye drops and helping them dress. (A.R. 269.)   Although she prepares her own meals daily, she needs to sit to prepare her meals, and use a step stool to sit while cooking. (A.R. 270.)   Mort performs household chores, including dusting, washing dishes and clothes, preparing dinner and other things as necessary. (A.R. 270.)   Mort goes outside daily, and shops for groceries as well as personal items, books and movies. (A.R. 271.)   She helps teach a weekly first and second grade

Sunday school class, goes to church, Wal-Mart and Hy-Vee. (A.R. 272.)   She indicated that since

her illnesses set in, it is a little harder to get around certain places, especially in cold and icy

conditions. (A.R. 273.)   Mort reported she has back pain and knee pain, making lifting, squatting,

bending, standing, walking, sitting and kneeling harder to do. (A.R. 273.)   She can walk 50 feet

before needing to stop and rest. (A.R. 273.)   She believes she can follow written instructions fairly

well, and her attention span depends on the medications she is on, and the amount of sleep she has

had. (A.R. 273.)

Mort's mother, Phyllis Mort, also completed three third-party function reports, with the

latest dated October 18, 2012. (A.R. 257-264.)   Mrs. Mort indicated that she spends time daily

with her daughter Susan. (A.R. 257.)   Mrs. Mort reported Susan cares for herself, helps with

chores around the house, and assists Mrs. Mort with grocery shopping and putting on support

stockings. (A.R. 258.)   Susan also prepares meals, does light housework around the house, reads,

watches TV and will do cross-stitch if her eyes are not bothering her. (A.R. 259-261.)   Susan

helps teach a Sunday school class, spends time with friends from church, and goes out to lunch

with friends. (A.R. 261.)   Mrs. Mort stated that Susan "has no mental problems so she can do all

things." (A.R. 261.)   Mrs. Mort further indicated Susan has no problem paying attention or

following instructions, either written or spoken. (A.R. 262.)

## D.   Testimony of Susan Mort

Mort presented testimony to Administrative Law Judge Thomas M. Donahue on January 9,

2014.   Mort discussed the issues she has had with her hands.   She testified that she feels

numbness in her hands every now and then, her hands tingle, and she feels "pins and needles" in

her hands from the pain. (A.R. 35.)   Mort stated that this has been slowly progressing. (A.R. 35.)

To make her hands feel better, Mort will let her hands hang or try to shake them out. (A.R. 35.)

As a result of these symptoms, it is harder for her to do things, such as tying her shoes and typing.

(A.R. 35-36.)   Sometimes she can type, but at other times her fingers will not cooperate. (A.R. 36.)   After a few minutes, her hands will go numb, and she will have to stop typing, and try to shake them out or let them rest. (A.R. 36.)   Using a telephone or cooking can aggravate her pain, and she finds herself switching hands with the phone because the phone starts to slip. (A.R. 36.) It takes her longer to use a knife to chop something, or to open a can with a can opener. (A.R. 37.) Mort was wearing braces to try to alleviate the symptoms in her hands, but the braces made her thumbs number than they had been, and caused more pain from rubbing her hands. (A.R. 37-38.) Mort described tremors in her hands that cause both of her hands to shake when she is holding a utensil or pen. (A.R. 38.)   She indicated she can no longer cross-stitch. (A.R. 38.)   Mort stated her doctors have talked about surgery to address issues with her hands. (A.R. 38-39.)

Mort also testified she suffers from edema just about every day, and to alleviate it she will try to keep her feet elevated above her heart. (A.R. 39.)   She takes medications to help with the edema, which does moderate it to some extent. (A.R. 39.)   Mort tries to keep her shoes on most of the time because the edema is worse when her shoes are off. (A.R. 39-40.)

Mort tries to help her parents as much as she can. (A.R. 40-41.)   She does most of the cooking, and the meal preparation for her parents. (A.R. 41.)   Mort indicated she tries to do easy things so she does not have to do heavy lifting. (A.R. 41.)   Mort helps her parents by writing checks for them. (A.R. 41.)   It has taken hours to write 30 checks, because she has to constantly stop to let her hands rest due to the symptoms and pain she has in her hands. (A.R. 41.)

## E. Findings of Administrative Law Judge

After the hearings, the ALJ made the following findings in a written decision issued on January 31, 2014:

> 1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.
>
> * * *

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 22, 2010 through her date last insured of December 31, 2013 (20 CFR 404.1571 *et seq*.).

\* \* \*

3. Through the date last insured, the claimant had the following severe impairments: lumbar degenerative disc disease with stenosis and anterolisthesis; bilateral hand osteoarthritis; osteoarthritis of the right knee; status post total left knee arthroplasty; obesity; depressive disorder versus adjustment disorder; dependent personality disorder (20 CFR 404.1520(c)).

\* \* \*

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\* \* \*

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) in that the claimant is capable of carrying/lifting ten pounds occasionally and less than ten pounds frequently, can sit two hours at a time for six hours of an eight hour day, and can stand/walk for 30 minutes at a time for two hours of an eight hour day. She can walk two blocks. The claimant can occasionally climb ramps/stairs and balance, but cannot climb ladders, ropes, and scaffolds or crouch. The claimant needs a job of SVP 4 or less and is limited to constant gross manipulation in both hands.

\* \* \*

6.   Through the date last insured, the claimant was capable of performing past relevant work as a receptionist and as a medical secretary. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

\* \* \*

Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform.

\* \* \*

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from January 22, 2010, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(f)).

(A.R. 14-23.)

## V. JUDICIAL REVIEW OF DECISION

A claimant is disabled if he is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting 42 U.S.C. §

1382c(a)(3)(A)).   "The [Social Security Administration] has established a five-step sequential process for evaluating disability claims." *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011).

> Step one determines whether the claimant is involved in substantial gainful activity. §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b). If so, the claimant is not disabled; if not, step two determines whether the claimant has a "severe" medically determinable impairment (or combination of impairments). §§ 404.1520(a)(4)(ii),(c); 416.920(a)(4)(ii),(c). If there is no severe impairment, the claimant is not disabled; if there is, step three determines whether the impairments are severe enough to meet a predetermined list of conditions (with duration requirements). §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d). If so, the claimant is disabled; if not, step four considers the residual functional capacity of the claimant - previously determined by the ALJ - and evaluates whether the claimant has the residual functional capacity to complete his or her past relevant work. §§ 404.1520(a)(4)(iv),(f); 416.920(a)(4)(iv),(f). If the claimant can complete past relevant work, the claimant is not disabled; if not, step five considers the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can do other work. §§ 404.1520(a)(4)(v),(g); 416.920(a)(4)(v),(g). If so, the claimant is not disabled; if not, the claimant is disabled.

*Cuthrell*, 702 F.3d at 1116-17; *see also Jimmerson v. Astrue*, 717 F.Supp.2d 840, 856 (S.D. Iowa 2010) (setting forth five-step evaluation).

Here, the ALJ utilized this five-step process, but Mort claims the ALJ erred in denying her claim for disability benefits.   She makes three principal arguments: (a) the ALJ failed to assess her peripheral venous insufficiency and pitting edema in the evaluation of serious impairments at step two; (b) the ALJ failed to account for osteoarthritis in her hands in determining the RFC; and (c) the ALJ failed to perform a function-by-function assessment of her mental restrictions in the RFC as required by SSR 96-8p. (*See* Brief (Dkt. 6) pp. 2, 8-13.)   While Mort asserts in her Complaint that the ALJ improperly rejected her subjective allegations (Complaint ¶ 11), she does not specifically address the issue in her briefing.   As reflected below, however, the ALJ's determination as to the credibility of Mort's subjective statements is critical to the review of the ALJ's decision in respect to those matters raised in Mort's briefs.

**A. Assessment of Peripheral Venous Insufficiency and Edema**

At step two of the analysis, the ALJ found Mort had the following severe impairments through the date last insured of December 31, 2013: "lumbar degenerative disc disease with stenosis and anterolisthesis; bilateral hand osteoarthritis; osteoarthritis of the right knee; status post total left knee arthroplasty; obesity; depressive disorder versus adjustment disorder; dependent personality disorder." (A.R. 15.)   The ALJ further stated:

> The above combination of impairments is severe in that they significantly limit the claimant's ability to perform basic work activities.
>
> In addition, other conditions have been alleged by the claimant or are otherwise found in the medical evidence. These conditions, to the extent they have been diagnosed by an acceptable medical source, do not have more than a minimal effect on the claimant's ability to perform basic work activities; accordingly, any condition not otherwise defined as "severe" is considered a non-severe impairment.

(*Id.*)

Mort complains that the ALJ failed to assess her peripheral venous insufficiency and edema as a severe impairment. (Pl.'s Brief pp. 8-11.)   In her view, "[t]here is no evidence that peripheral venous sufficiency was actually considered in any manner by the ALJ." (*Id.* p. 9.) Mort claims "she had persistent edema that required her to elevate her legs for significant periods of time during the day" but the ALJ did not evaluate whether her "peripheral venous insufficiency impacted her basic work activities." (*Id.*)

In support of her argument, Mort refers to certain medical records. (*Id.* pp. 9-10.)   She first cites to the record of her visit to the Primary Care Clinic at Broadlawns Medical Center on November 9, 2012, which notes Mort complained of "swelling/varicose veins ankles – pt says ever since she got her knee replaced she's had spider veins in her ankle, she doesn't elevate them much." (A.R. 682.)   The exam notes indicate "edema bilat lower extremities; left ankle-reticular veins" with an assessment of "peripheral venous insufficiency." (A.R. 683, 684.)

Mort also refers to the three visits with Dr. Murdoch at the Foot and Ankle Clinic during

which she was assessed with onychomycosis (fungal infection of the toenails).   On December 4, 2012, she complained "of long thick painful nails." (A.R. 679.)   Dr. Murdoch's objective findings included: "Patient has absent pedal hair noted at this time for a bilateral feet. Skin texture and turgor are diminished with some pitting edema bilateral feet. Patient does have some dystrophy and discoloration noted that the toenails x10." (*Id.*)   On March 4, 2013, Mort again complained "of long thick painful nails." (A.R. 697.)   Dr. Murdoch's objective findings again stated: "Patient has absent pedal hair noted at this time for a bilateral feet. Skin texture and turgor are diminished with some pitting edema bilateral feet. Patient does have some dystrophy and discoloration noted that the toenails x10." (*Id.*)   Mort then saw Dr. Murdoch on September 3, 2013, again complaining "of long thick painful nails," which resulted in objective findings by Dr. Murdoch as follows:

> Pulses are palpable to the bilateral feet 2/4 for the DP/PT. Capillary refill time is less than 3 seconds to the digits of the bilateral feet. Pedal hair is absent at this point in time to the bilateral feet. Slight edema is noted at this point to the bilateral feet. Protective sensation is intact to bilateral feet. Proprioceptive sensation is also intact to the bilateral feet. The patient has no evidence of nerve entrapment noted to the bilateral feet. No evidence of clonus is noted to the bilateral feet.

> No open lesions or ulcerations or to the skin bilateral feet. Patient has absent pedal hair noted at this time for a bilateral feet. Skin texture and turgor are diminished with thinning and atrophy noted to the bilateral feet. Patient does have some dystrophy and discoloration noted that the toenails x10. Patient's left second toenail is loose at this point in time with some bleeding noted underneath nail.

> Range of motion is full to the bilateral feet and ankle joints. Muscle strength is 5 out of 5 for all extrinsic muscles of the bilateral feet or ankles. The patient has no evidence of tendinopathy noted at this point in time to the bilateral feet or ankles. Patient has no evidence of instability or ligamentous laxity noted at this point in time to the bilateral feet or ankles.

(A.R. 726.)

Finally, Mort refers to her visit with Dr. Asner at the Primary Care Clinic on September 9, 2013, which, according to the records, was for "[m]edication evaluation for hypertension, lab results for LFT's." (A.R. 721.)   Mort's subjective complaints were noted as follows:

17

> Pt is here to follow up on her change from Lisinopril to Norvasc, she states that her cough is gone and she is really happy, her BP is stable on Norvasc. She also states that she is getting edema in her ankles. She states that the skin is tight and podiatry told her her LFT's were elevated. She does have fatty liver and she states that she is not taking Tylenol at all. She states that she is taking Naproxin for the joint pain.

(*Id.*)  Dr. Asner's examination notes indicated "2 plus edema b/l feet" and included an assessment of peripheral venous insufficiency. (A.R. 723.)

Mort also relies upon her own hearing testimony during which she indicated she has swelling in her legs "[a]bout everyday." (A.R. 39.)  She further testified: "I try to keep them elevated above my heart, but my recliner chair doesn't quite go back that far. So I get them as high as I can." (*Id.*)  When asked how much of the day she has to "keep them elevated to manage it," Mort responded: "I think at least once – two or three hours a day or more. I – like I'll sit down in the chair for about a half an hour, if not longer, and elevate them, and then about an hour or two later I'll put them up – back up again . . . ." (A.R. 40.)  Mort also notes that the vocational expert, upon questioning by her counsel, testified work would not be available for a person "needing to elevate their feet at waist level or higher for two to three hours a day total." (A.R. 44-45.)

After citing to those portions of the record, Mort argues "[t]he evidence shows that this edema limited her ability to function on a consistent basis without having to elevate her feet for extended periods of time. This condition should have been considered as a severe impairment." (Pl.'s Brief p. 10.)  She further contends that "at minimum, the ALJ should have provided an explanation that it was actually considered at step two, and why it was determined to be severe or non-severe." (*Id.*)  She relies upon the following provision of Social Security Ruling 96-3p:

> A determination that an individual's impairment(s) is not severe requires a careful evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.

(Pl.'s Reply Brief p. 3; quoting SSR 96-3p.)

In response, the Commissioner argues that while Mort "cites to various medical findings showing she had both the diagnosis of peripheral venous sufficiency and instances of edema, she has failed to provide a single instance where a medical provider limited her activities based on either the diagnosis or findings." (Def.'s Brief p. 5.)   In the view of the Commissioner, the evidence "roundly contradicts" Mort's claim that persistent edema required her to elevate her legs for significant periods of time. (*Id.* p. 6.)   The Commissioner emphasizes that none of the medical evidence referred to by Mort discusses a need to elevate her legs or contains a recommendation from a doctor to elevate her legs. (*Id.*)   The Commissioner also points out that Mort's edema was described by Dr. Murdoch as "some" on March 4, 2013, and as "slight" on September 3, 2013. (*Id.*; citing A.R. 697, 726.)   The Commissioner further notes Dr. John Callaghan's recommendation in June of 2010, a year after Mort's knee replacement, for "her to walk as much as she could" and Mort's report to the Primary Care Clinic on November 9, 2012, that she does not elevate her ankles "much." (*Id.*; citing A.R. 377, 682.)

This Magistrate Judge finds the Commissioner's argument to be persuasive.   Contrary to Mort's assertion, the medical evidence in the record does not establish that her peripheral venous insufficiency and edema are severe impairments.   Instead, the medical evidence supports a finding that those conditions are non-severe impairments.   As explained by the Eighth Circuit,

> [a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. *See Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *id.* at 158, 107 S.Ct. 2287 (O'Connor, J., concurring); 20 C.F.R. § 404.1521(a). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007). It is the claimant's burden to establish that his impairment or combination of impairments are severe. *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir.2000). Severity is not an onerous requirement for the claimant to meet, *see Hudson v. Bowen,* 870 F.2d 1392, 1395 (8th Cir.1989), but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing. *See, e.g., Page,* 484 F.3d at 1043–44; *Dixon v. Barnhart,* 353 F.3d 602, 605 (8th Cir.2003); *Simmons,* 264 F.3d at 755; *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th

Cir.1997); *Nguyen v. Chater,* 75 F.3d 429, 431 (8th Cir.1996).

*Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007); *see also Jimmerson*, 717 F.Supp.2d at 858-59 (quoting *Kirby,* 500 F.3d at 707, 708).

The medical records here which relate to peripheral venous insufficiency and edema fail to show, or even discuss, how those conditions limit in any manner Mort's physical or mental ability to do basic work activities.   As noted by the Commissioner, the only evidence supporting Mort's claims of limitations in her ability to do basic work activities is her own subjective testimony. The ALJ found, however, that Mort's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (A.R. 19.)

The standards for evaluating a claimant's subjective complaints are well-established as set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

> [T]he ALJ must consider the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. The ALJ is not required to discuss each *Polaski* factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints.

*Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (internal citations and quotations omitted); *see also Buckner*, 646 F.3d at 558.

"Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing *Polaski,* 739 F.2d at 1322); *see also Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006); *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004).   The ALJ is required, however, to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford,* 518 F.3d at 982 (quoting *Lewis v. Barnhart,* 353 F.3d 642, 647 (8th Cir. 2003)).

Where an ALJ seriously considers but for good reasons explicitly discredits a claimant's

subjective complaints, the court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *Buckner*, 646 F.3d at 558.   "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Bradley*, 528 F.3d at 1115 (quoting *Pearsall*, 274 F.3d at 1218).   Thus, courts "'defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Mabry v. Colvin*, 815 F.3d 386, 389 (8th Cir. 2016) (quoting *Johnson v. Colvin*, 788 F.3d 870, 872 (8th Cir. 2015) (quoting *Gonzales*, 465 F.3d at 894)); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006); *see also Jimmerson*, 717 F.Supp.2d at 859 (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

The ALJ's credibility determination in this case is supported by good reasons and substantial evidence.   In general, the ALJ stated:

> Although the claimant has described symptoms and daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported symptoms and limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(A.R. 19-20.)   The ALJ continued with a fairly in depth analysis and explanation which sufficiently details the reasons for discrediting the subjective limitations expressed by Mort, including both mental and physical, and sets forth inconsistencies found in the record. (A.R. 20.) In regard to physical limitations, the ALJ noted:

> Although she has pain associated with her physical condition, she is able to sustain periods of standing and walking. The claimant has good use and strength in her arms and legs. There is no evidence of severe nerve damage or muscle wasting. While she does have limitations and should avoid strenuous activities, considering her overall condition, age, education and past work, she is not precluded from all work.

> The claimant has not generally received the amount and type of medical treatment one would expect for a totally disabled individual, considering the relatively infrequent trips to the doctor for the allegedly disabling symptoms and significant gaps in the claimant's history of treatment.

(A.R. 20.)   Those determinations by the ALJ are supported by the medical records, including Dr. Murdoch's objective findings on September 3, 2013, when he found, *inter alia*, "[m]uscle strength is 5 out of 5 for all extrinsic muscles of the bilateral feet or ankles." (A.R. 726.)

But in fairness, it must be noted that the ALJ did not explicitly refer to peripheral venous insufficiency or edema either under step two or within his discussion of Mort's credibility.   As recognized by the Eighth Circuit, however, "'an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Chaney v. Colvin*, 812 F.3d 672, 678 (8th Cir. 2016) (quoting *England v. Astrue*, 490 F.3d 1017, 1022 (8th Cir. 2007)).   In addition, "'an arguable deficiency in opinion writing that had no practical effect on the decision . . . is not a sufficient reason to set aside the ALJ's decision.'" *Hensley v. Colvin*, 2016 WL 3878219, at *4 (8th Cir. July 18, 2016) (quoting *Welsh v. Colvin*, 765 F.3d 926, 929 (8th Cir. 2014)).

Although stated in general terms, the ALJ here did note, at step two, that

> other conditions have been alleged by the claimant or are otherwise found in the medical evidence. These conditions, to the extent they have been diagnosed by an acceptable medical source, do not have more than a minimal effect on the claimant's ability to perform basic work activities; accordingly, any condition not otherwise defined as "severe" is considered a non-severe impairment.

(A.R. 15.)   When read within the context of the ALJ's entire written decision and the record as a whole, Mort's peripheral venous insufficiency and edema fall within the ALJ's reference to "other conditions."   In the opinion of this Magistrate Judge, the ALJ's credibility determinations in regard to Mort's alleged physical limitations as noted above apply equally to Mort's claim that "she had persistent edema that required her to elevate her legs for significant periods of time during the day." (Pl.'s Brief p. 9.)   Mort's assertion is not only inconsistent with the objective medical evidence which reveals relatively infrequent and minimal treatment for her peripheral

venous insufficiency and edema, but is completely unsupported by any medical record indicating those conditions required elevation of her legs for significant periods of time each day.

For those reasons, in the opinion of this Magistrate Judge, the ALJ did not err at step two of the sequential analysis by not including peripheral venous insufficiency and edema as severe impairments.[2]

## B. Accounting for Osteoarthritis in Hands in Determining RFC

Mort claims that the ALJ erred by failing to sufficiently account for the osteoarthritis in her hands in assessing her residual functional capacity ("RFC"). (Pl.'s Brief pp. 11-13.)   When determining whether a claimant can engage in substantial employment, the ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC. *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003).   Residual functional capacity is a function-by-function assessment of an individual's ability to do work-related activities despite his or her physical or mental limitations. *See, e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007); *Roberson v. Astrue,* 481 F.3d 1020, 1023 (8th Cir. 2007); *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004); *Depover v. Barnhart,* 349 F.3d 563, 565 (8th Cir. 2003).   In other words, "[a] claimant's RFC represents the most he

---

[2] In her initial Brief (Dkt. 6), Mort states that "[p]eripheral venous insufficiency was not considered in the ALJ's RFC assessment," which was addressed by the Commissioner in resistance. (*Id.* p. 11.)   In her Reply Brief (Dkt. 11), however, Mort clarifies:

> That is not Plaintiff's argument. Rather, Plaintiff argues that the error occurred earlier in the 5-step analysis. Plaintiff argues that the ALJ erred at Step 2 in failing to consider or assess whether Mort's peripheral venous insufficiency and edema were serious impairments. Thus, the issue is not whether at Step 4 the ALJ's final residual functional capacity should have included limitations related to peripheral venous insufficiency and edema (although, had the ALJ assessed the condition, the law supports that it should have been reflected in the RFC). Rather, the issue asserted on appeal is that the ALJ failed to assess peripheral venous insufficiency and edema as one of her serious impairments at Step 2 of the analysis.

(*Id.* p. 2.)

can do despite the combined effects of all of his credible limitations and must be based on all credible evidence." *McCoy*, 648 F.3d at 614; *see also Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); 20 C.F.R. § 404.1545.

"[A] claimant's RFC is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (quoting *Lauer*, 245 F.3d at 704); *see also Martise*, 641 F.3d at 923.   "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (internal citations and quotation marks omitted); 20 C.F.R. § 404.1545 ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").   "The ALJ bears the primary responsibility for determining a claimant's RFC . . . . However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Martise*, 641 F.3d at 923 (citation and internal quotation marks omitted); *see also Baldwin*, 349 F.3d at 556 ("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC.")

In this case, the ALJ found Mort had the following RFC:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) in that the claimant is capable of carrying/lifting ten pounds occasionally and less than ten pounds frequently, can sit two hours at a time for six hours of an eight hour day, and can stand/walk for 30 minutes at a time for two hours of an eight hour day. She can walk two blocks. The claimant can occasionally climb ramps/stairs and balance, but cannot climb ladders, ropes and scaffolds or crouch. The claimant needs a job of SVP 4 or less and is limited to constant gross manipulation in both hands.

(A.R. 16.)   The ALJ then compared the mental and physical demands of Mort's past relevant work with her RFC, and found Mort is capable of performing her past relevant work as a receptionist and medical secretary. (A.R. 21-22.)   The ALJ made an alternative finding that Mort is also capable of performing other jobs existing in the national economy including appointment

clerk, telephone quotation clerk, order clerk and call out operator. (A.R. 22-23.)

Mort argues, however, that the ALJ erred by "allowing unlimited handling and fingering" in the RFC. (Pl.'s Brief pp. 11-13.)   She emphasizes she "has advanced osteoarthritis in both hands as well as carpal tunnel" and refers to the results of her MRI in March of 2011 showing "Grade 3 osteoarthritis of the right third distal interphalangeal joint" and "Grade 2 osteoarthritis of the right and left second DIP joints, both first carpometacarpal joint and first metacarpal phalangeal joints." (*Id.* pp. 12-13; citing A.R. 512.)   She also refers to her reports of pain and tremors in her hands in the Pain/Fatigue Questionnaire dated October 11, 2012. (*Id.* p. 12; citing A.R. 265.)   In addition, she notes the three occupational therapy sessions in July and August of 2013 "for diagnosis of bilateral CTS" during which she reported "pain as high as 5/10 during day, numbness varies but mainly in thumb/index digits" but experienced no change in her symptoms. (*Id.* p. 13; citing A.R. 700.)

Mort further relies upon her testimony in January of 2014 during which she explained the issues with her hands:

> Well, my fingers will go numb, and it just feels like they go ice cold, and they just get pins and needles, . . . I have to let – sometimes let them hang because if I have them at my level of normal, then they hurt, and if I let them hang and shake them out, sometimes they feel better.

(A.R. 35.)   She further explained that "it's getting harder . . . to do things like tie my shoes." (*Id.*) She further noted that "typing is getting harder. Sometimes I can do it, but my fingers won't cooperate. . . . so I have to sometimes just do the one-finger hen peck." (A.R. 36.)   When asked if she could type for an extended period of time, Mort responded:

> It hurts. After about two or three minutes, my hands will start to go numb, and I have to stop, and I have to just lay them off and shake them out. . . . [S]ometimes it's just they're – they go ice cold. It's just like they feel like they've gone ice cold and numb, and I have to sit there and let them hang and sometimes it's like four or five minutes before they feel like they're back to normal.

(*Id.*)

Mort argues that "[c]ontrary to the medical evidence showing [her] end stage osteoarthritis, the ALJ's RFC provided for constant gross manipulation in both hands. Thus, the ALJ did not provide any limitation for [her] in regard to her ability to perform gross or fine manipulation." (Pl.'s Brief p. 12.)   She notes that, because "constant" is the highest level possible for physical demands, it is not a restriction. (*Id.*; citing POMS 25001.001(B)(35).)

In support of her argument, Mort primarily relies upon Social Security Ruling 96-8p which explains that, "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p.   She further emphasizes that "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most.*" (*Id.*)   Mort also notes that

> [t]he adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.

(*Id.*)

In response, the Commissioner contends that Mort has failed to provide medical evidence of any additional limitations related to her hand impairments which were not already accounted for in the RFC. (Def.'s Brief pp. 7-9.)   In the Commissioner's view, the evidence cited by Mort "contains no indication of either loss of use or strength of her hands" and "the physical therapy notes she relies on merely state [she] continued to have more than one or two incidents of numbness, tingling, or pain, in her hands each day when performing her activities of daily living." (*Id.* p. 8; citing A.R. 700.)   The Commissioner argues that "[s]imply having isolated instances of some combination of pain, tingling, or numbness, in a single day is insufficient to establish the existence of limitations precluding her ability to carry/lift ten pounds occasionally and less than

ten pounds frequently or to use her hands for manipulation." (*Id.*)  On that point, the Commissioner notes Mort's "upper extremity strength was routinely normal." (*Id.*; citing A.R. 390, 503, 572.)  The Commissioner further notes that Mort "failed to voice hand pain or limitations any time after her physical therapy ended, despite her obtaining treatment for other ailments." (*Id.*; citing A.R. 706-756.)

In addition, the Commissioner points out that Mort's "past relevant work of receptionist and medical secretary involved only frequent handling and occasional fingering." (*Id.* p. 9; citing A.R. 43-44.)  It is further noted that the ALJ found Mort could perform both of those jobs, as well as the jobs of appointment clerk, telephone quotation clerk, order clerk, and call out operator, all of which involve limitations to frequent or occasional handling and fingering. (*Id.*; citing A.R. 44.)  The Commissioner argues that even if Mort provided sufficient medical evidence of additional limitations in her handling or fingering that are not accounted for in the ALJ's RFC assessment, "she has not shown those alleged limitations would limit her to less than occasional handling or fingering." (*Id.*)

This Magistrate Judge again finds the Commissioner's argument to be persuasive.  In determining the RFC, the ALJ explicitly referred to Mort's "alleged disability due to arthritis [and] carpal tunnel syndrome" and stated:

> Turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than those given in the residual functional capacity or a finding of total disability.

(A.R. 17.)  In reviewing the records, the ALJ acknowledged that Mort "had x-rays that showed varying levels of osteoarthritis in her hand and finger joints" and further noted

> that since about December 2012 (coincidentally when she received notice her disability claim was denied at the reconsideration level), the claimant frequently presented to her general practitioner with a host of new or worsened symptoms and medical conditions []. These complaints ranged from ongoing low back pain,

varicose veins since her 2008 knee replacement, daily bloody nose, shortness of breath, constant ringing in her ears, constant fatigue, pain and numbness in her upper extremities bilaterally with tremor, frequent urinary tract infection, and stress incontinence.  She refused further physical therapy for back pain but underwent a course of occupational therapy for carpal tunnel syndrome symptoms in summer 2013. She was discharged without improvement, although the claimant acknowledged non-compliance with her home therapy exercises. Electromyography testing did confirm mild to moderate carpal tunnel syndrome bilaterally.

(A.R. 18.)  As discussed above, after reviewing the medical evidence, the ALJ found Mort's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible." (A.R. 19.)

Again, Mort has not presented a sufficient challenge for this Court to disturb the ALJ's credibility determination.  In addition, there is substantial evidence in the record, as a whole, which supports the ALJ's accounting of Mort's osteoarthritis in the RFC.  Moreover, a different outcome would not be reached even if there is sufficient medical evidence supporting additional limitations in Mort's handling or fingering that are not accounted for in the RFC.

According to the vocational expert, Mort's prior work as a receptionist involves frequent handling and occasional fingering and a medical secretary involves frequent handling and fingering. (A.R. 43-44.)   Thus, even if those additional limitations were added to the RFC, Mort would still be found to be capable of performing her past relevant work.   Mort has not sufficiently shown any further limitations should be included in the RFC due to her osteoarthritis. *See*, *e.g.*, *Mabry*, 815 F.3d at 390 ("The claimant has the burden to establish [her] RFC.").   "'The mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner does not allow this Court to reverse the decision of the ALJ." *Johnson v. Colvin*, 788 F.3d at 873 (quoting *Johnson v. Barnhart,* 390 F.3d 1067, 1070 (8th Cir. 2004)).

For those reasons, in the opinion of this Magistrate Judge, the ALJ did not err in the assessment of the osteoarthritis in Mort's hands in determining the RFC.

## C. Function-by-Function Assessment of Mental Restrictions in Determining RFC

Mort contends the ALJ failed to provide a function-by-function assessment in relation to her ability to perform mental work activities. (*See* Pl.'s Brief pp. 13-15.)  She cites to Social Security Ruling 96-8p which provides: "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p.  "The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual." (*Id.*)  "Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions." (*Id.*)  "As with exertional capacity, nonexertional capacity must be expressed in terms of work-related functions." (*Id.*)

> Work-related mental activities generally required by competitive, renumerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.

(*Id.*)

Mort complains that the ALJ here did not perform a function-by-function assessment of her nonexertional capacity in terms of work-related mental activities but merely found she "needs a job of SVP 4 or less" in the RFC. (*See* Pl.'s Brief p. 14.)  The "SVP" is a job's level of "specific vocational preparation" time which reflects "how long it generally takes to learn the job." *Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998) (citing Dictionary of Occupational Titles).  "An SVP level of 'three' indicates that a job requires more than one month and up to three months of training; while an SVP level of 'four' would require more than three months and up to six months of training." (*Id.*)  Jobs with SVP levels of 1 or 2 are considered unskilled work and jobs with SVP levels of 3 or 4 are considered to be semiskilled work. (*Id.*)

In Mort's view, the specification of a SVP level in the RFC "does not comply with the

function-by-function requirement." (*Id.*)   Instead, she contends the RFC must include an assessment of her "ability to perform any non-exertional functions, such as: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." (*Id.*)   She notes that the ALJ found that her serious impairments included "depressive disorder versus adjustment disorder" and "dependent personality disorder" and determined the combination of her impairments "significantly limit the claimant's ability to perform basic work activities." (*Id.* p. 15; citing A.R. 15.)   Based on those findings, Mort argues the ALJ was required to include a function-by-function assessment of her mental abilities in the RFC. (*Id.*)

The Commissioner, on the other hand, contends that the RFC assessment limiting Mort to a "job of SVP 4 or less" was "adequate to capture the concrete consequences of [her] impairments." (Def.'s Brief p. 9.)   In addition, the Commissioner contends Mort has failed to show the ALJ's "assessment should have included more specific limitations." (*Id.* p. 10.)   On the later point, this Magistrate Judge agrees with the Commissioner.

Contrary to the suggestion of Mort, the ALJ's assessment of her mental health was not lacking.   Instead, the written decision reflects that the ALJ thoroughly considered Mort's mental health issues, including as to work-related mental activities, but ultimately determined further limitations to the RFC were not warranted based on the underlying record.   The ALJ included "depressive disorder versus adjustment disorder" and "dependent personality disorder" as severe impairments at step two. (A.R. 15.)   Then, at step three, the ALJ found the severity of Mort's "mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listing 12.04." (A.R. 15.)   In doing so, the ALJ stated:

> In activities of daily living, the claimant has only mild restriction. The claimant experiences no more than mild difficulties in social functioning. With regard to concentration, persistence or pace, the claimant has moderate difficulties. The extent of the limitations described on the claimant's functioning is further

discussed below in the residual functional capacity section of the decision. The claimant has not experienced any episodes of decompensation during the relevant period within the definition of the regulations.

(A.R. 15.)   In the subsequent RFC assessment at step four, the ALJ stated:

> As for mental health issues, the claimant alleged depression in her disability application but did not receive formal mental health treatment, however is prescribed psychotropic medication. She had been seen for psychological evaluation in connection with a prior application, when the psychologist diagnosed Adjustment Disorder with depressed mood and Dependent Personality Features; and assessed a Global Assessment of Functioning score in the moderate range at 57. That examiner opined that claimant appeared suited to a wide range of unskilled and some skilled employment positions. She was again referred for psychological evaluation for disability determination purposes in September 2012 [], at which time she reported that she is "depressed all the time" and she "cries on a daily basis." The claimant alleged a worsening of mood over the past few years. Her thoughts were clear and associations appropriate during a mental status examination; she completed serial 3 at an appropriate rate, recalled 3/3 items upon a 5-minute delay, and proverb interpretation was intact and reasonably abstract. The psychologist diagnosed Depressive Disorder, not otherwise specified and Adjustment Disorder with depressed mood related to pain, and assessed a moderate GAF at 55 and opined that claimant's mental and physical status would make the maintenance of attention, concentration, and pace difficulty, but that her other abilities are intact. This opinion is taken into consideration, but is given partial weight as it combines claimant's physical and mental limitations.

(A.R. 18-19.)   The ALJ also discussed, as follows, the credibility of Mort's claim of being unable

to work because of her mental health:

> From a mental perspective, she does report significant limitations beyond struggles with concentration, following spoken instructions, and handling stress/changes in routine. A third party (mother) report is generally consistent, but the claimant's mother indicated no mental limitations, stating that claimant "is not mentally handicapped, just physically." Her objective findings do not show that she is being treated for severe mental impairments. Medical evidence indicates that she cares for her elderly mother. The claimant also states that she teaches a first and second grade Sunday School class. Her allegations of mental impairment are partially credible as it is unclear why she has not sought out formal mental health treatment for her alleged lifelong depression. In addition, there is an inconsistency in file between claimant's report of significant symptoms of depression and her mother's statement that her impairments are all physical, not mental. *Overall, she does not attribute significant limitations to her mental impairment that would preclude her from work-related activities. In addition, there is no objective evidence to support significant functional limitations related to her mental impairment.*

. . . Although she alleges mental concerns, the claimant is able to think and act in her own best interest and her mental condition is not of the severity to prevent her from performing work like activity.

(A.R. 20 (emphasis added).)  Finally, the ALJ referred to the RFC "conclusions reached by the physicians employed by the Iowa Disability Determination Services" as additional support for finding Mort "not disabled." (A.R. 21.)  The ALJ found there was no objective evidence contradicting those conclusions and, therefore, "the opinions are entitled to substantial weight." (A.R. 21.)  The ALJ explicitly "adopt[ed] the restrictions found in the opinions" and "incorporated them into the residual functional capacity." (A.R. 21.)  As set forth above in section IV(B), those opinions included assessments of Mort's ability to perform non-exertional functions. (A.R. 537, 551, 592, 660-661.)

As reflected, the ALJ's assessment of Mort's mental health issues was in depth and reliant upon evidence in the record found to be credible.  Mort, again, has not presented a sufficient challenge to the ALJ's credibility determination in regard to alleged limitations due to her mental impairments.  On that point, it is noteworthy that Mort did not address, or even mention, any limitations to her ability to perform non-exertional functions or work-related mental activities during the hearing before the ALJ. *See*, *e.g.*, *Mabry*, 815 F.3d at 390 ("The claimant has the burden to establish [her] RFC.").  Based upon this Magistrate Judge's review, the ALJ's statements and findings related to Mort's mental health condition, and ability to perform work-related mental activities, are supported by substantial evidence in the record as a whole.

For those reasons, the ALJ did not err in the assessment of Mort's mental health impairments in determining the RFC.

## VI. RECOMMENDATION

After a thorough examination of the evidence and in accordance with the standard of review the Court must follow, this Magistrate Judge concludes that the ALJ's determination that

Susan Mort is not disabled under the Social Security Act complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.   Accordingly, it is recommended that the final decision denying disability benefits to Susan Mort be affirmed and judgment be entered in favor of defendant Commissioner of the Social Security Administration.

Pursuant to Federal Rule of Civil Procedure 72(b)(2), the parties shall have 14 days from the date of this Report and Recommendation to serve and file specific objections to the proposed findings and recommendations.

Dated August 4, 2016.

STEPHEN B. JACKSON, JR.
UNITED STATES MAGISTRATE JUDGE